UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Ryan Wehner,                                                  Civil No. 06-1709
                              (JMR/FLN)


            Plaintiff,

            v.                               **REPORT AND**
                                             **RECOMMENDATION**
Linvatec Corproration d/b/a CONMED Linvatec,
a wholly-owned subsidiary of CONMED Corporation,
CONMED Corporation, Linvatec Biomaterials, Inc.,
a wholly-owned subsidiary of CONMED
Corporation, and Linvatec Biomaterials Oy, a
wholly-owned subsidiary of CONMED Corporation,


            Defendants.
_____

Daniel A. O'Fallon for Plaintiff.
Gordon H. Hansmeier for Defendants.
_____

**THIS MATTER** came before the Court on September 28, 2007, for a hearing on

Defendants' Motion for Partial Summary Judgment [#86] and Defendants' Daubert Motion to

Exclude Portions of Dr. Michael Q. Freehill's Testimony [#93].  The matter was referred to the

undersigned for Report and Recommendation pursuant to 28 U.S.C. § 636 and Local Rule 72.1.  For

the reasons which follow, this Court recommends the Motion be **GRANTED in part** and **DENIED**

**in part**.

## I.  UNDISPUTED FACTS

Plaintiff Ryan Wehner brings this products liability suit, alleging that a defective surgical

implant caused severe injury to his left shoulder.  In September 2001, Mr. Wehner injured his

shoulder playing in a high school football game.  (See South Surgical Center record dated December 21, 2001 attached as Exhibit C to the Affidavit of Richard W. Sobalvarro.)  On June 10, 2002, Dr. Corey Welchlin performed arthroscopic surgery on Wehner's shoulder "to debride anterior, posterior and superior labral tears and to repair SLAP and Bankart lesions."  (Def. Br. at 2.)  Dr.Welchlin implanted two Bionx Bankart tacks into Wehner's shoulder to reduce the anterior and superior labral tears.  (See South Surgical Center record dated June 10, 2002, attached as Exhibit B to the Affidavit of Richard W. Sobalvarro.)  The tacks were designed to completely dissolve over time.  (See Bionx Implants, Inc. 510(k) Submission attached as Exhibit D to the Affidavit of Richard W. Sobalvarro.)  Wehner alleges that the failure of the tacks to dissolve caused him to suffer "the pain and disability of a deteriorated and low-functioning shoulder" and will require him to undergo multiple future surgeries in the next few years, including a shoulder replacement.  (Amend. Compl. ¶ 12.)

Defendant ConMed Corporation has its principal place of business in New York.  (Pl. Ex. 19)  The remaining defendants, Linvatec Corporation, Linvatec Biomaterials, Inc. and Linvatec Biomaterials, Oy are subsidiaries of ConMed.  (*Id.*)  Bionx Implants, Inc. was a Pennsylvania corporation until January of 2003 that marketed and sold the Bionx Bankart tack in the United States.  Its wholly-owned subsidiary Bionx Implants, Ltd., located in Tampere, Finland, manufactured the tack.  In January of 2003, ConMed acquired Bionx by merger.  (Pl. Ex. 21.)  ConMed merged Bionx into a subsidiary, Arrow, created only for the purpose of the merger.  (*Id.* at § 1.1.)  Through this deal, Bionx became a wholly-owned subsidiary of ConMed.  (Pl. Ex. 20.)  On April 22, 2003, the board of directors of Bionx changed the name of the company to Linvatec Biomaterials, Inc. and Linvatec Biomaterials, Ltd.  for marketing purposes.  (Pl. Ex. 22.)

Plaintiff alleges Strict Liability (Count I), Breach of Express Warranty (Count II), Breach

of Implied Warranty (Count III), Negligence (Count IV), Misrepresentation (Count V) and violation

of the False Advertising Act, the Consumer Fraud Act, the Unlawful Trade Practices Act and the

Uniform Deceptive Trade Practices Act (Count VI).

Defendants move for summary judgment on Counts I and IV insofar as they allege a failure

to warn, and on Count V and Count VI.  Defendants also request summary judgment on all claims

with respect to ConMed Corporation and Linvatec Corporation.  In a separate motion, Defendants

also move to exclude portions of Dr. Michael Q. Freehill's testimony at trial.

## II.  STANDARD OF REVIEW

According to Federal Rule of Civil Procedure Rule 56, summary judgment is appropriate

when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with

the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving

party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  In order to determine

whether a certain fact is material, " it is the substantive law's identification of which facts are critical

and which facts are irrelevant that governs."  *Anderson v. Liberty Lobby, Inc*, 477 U.S. 242, 248

(1986).  Summary judgment will not be granted "if the dispute about a material fact is 'genuine,'

that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."

*Id*.  "The inquiry performed is the threshold inquiry of determining whether . . . there are any

genuine factual issues that properly can be resolved only by a finder of fact because they may

reasonably be resolved in favor of either party."  *Id*. at 250.

When determining whether to grant a motion for summary judgment, a court must view all

of the facts in the light most favorable to the non-moving party and give the non-moving party the

benefit of all reasonable inferences that can be drawn from those facts. *Matsushita Elec. Indus. Co.*

3

*v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986).  When the moving party brings forth a proper summary judgment motion, the "adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial."  Fed. R. Civ.P. 56(e); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) ("Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c).")

### III.  <u>CONCLUSIONS OF LAW</u>

**A.   Plaintiff's Claims Under the False Advertising Act, the Consumer Fraud Act, the Unlawful Trade Practices Act and the Uniform Deceptive Trade Practices Act (Count VI)**

**1.   Plaintiff may not bring claims under the Private Attorney General Act.**

The False Advertising Act, Minn. Stat. § 325F.67, the Consumer Fraud Act, Minn. Stat. § 325F.69, and the Unlawful Trade Practices Act, Minn. Stat. § 325D.13, do not provide for private causes of action.  An individual plaintiff may, however, in limited circumstances, bring these causes of action under the Minnesota Private Attorney General Act.  "The Private AG Act offers 'an incentive for defrauded customers to bring claims in lieu of the attorney general.'" *Pecarina v. Tokai Corp.*, 2002 WL 1023153, *5 (May 20, 2002) (citing *Ly v. Nystrom*, 615 N.W.2d 302, 311 (Minn. 2000).  Because a private plaintiff who brings an action under the Private AG Act is acting for the Attorney General who brings claims on behalf of the state, the private plaintiff's cause of action must benefit the public.  *Ly*, 615 N.W.2d at 313.  The issue here is whether the claims set forth in Count VI benefit the public, a requirement for bringing claims under the Private Attorney General Act.  Minn. Stat. § 8.31.

In determining whether a cause of action benefits the public, courts focus on the form of the alleged misrepresentation and the type of relief sought by the plaintiff. *Zutz v. Case Corp.*, 2003 WL 22848943, *4 (Nov. 21, 2003). "Where recovery is sought for the exclusive benefit of the plaintiff there is no public benefit." *Id.* In *Zutz*, the court dismissed the cause of action under the Private AG Act because the plaintiff sought only compensatory damages. Similarly, in *Pecarina*, the plaintiff's claim was dismissed because plaintiff sought only damages "for past and future medical expenses, pain and suffering, wage loss and emotional distress." 2002 WL 1023153 at *5. The court reasoned that rather than benefitting the public, the redress is meant to compensate plaintiffs for their injuries. *Id.* "Plaintiffs may not craft their products liability suit to bring it within the ambit of the Private AG Act." *Id.*

In Count VI, Plaintiff seeks damages for past and future medical expenses, past wage loss, loss of future earning capacity, past and future pain, suffering, disability and emotional distress. (Amend. Compl. ¶ 44.) In his general prayer for relief, Plaintiff seeks only damages. (Amend. Compl. ¶ 44.) In ¶ 43 of the Amended Complaint, Plaintiff requests "any other equitable relief as deemed by this Court" but makes no specific request for relief that might be deemed to benefit the public. Regardless, Plaintiff is not entitled to equitable relief for a past injury. *Cherne Indus., Inc. v. Grounds & Assocs., Inc.,* 278 N.W.2d 81, 92 (Minn. 1979). The court grants equitable relief upon a showing that there is an inadequate legal remedy alternative and the nonmoving party's current conduct is causing irreparable harm to the moving party. *Id.* If such a showing is made, a court order is issued to stop the non-moving party from continuing to cause irreparable harm. *Id.* Because Defendant's current conduct is not causing the Plaintiff harm, injunctive relief is not proper.

At the hearing, Plaintiff's counsel contended that Plaintiff's case benefitted the public

because after the Defendants' 30(b)(6) witness's deposition in June, the Defendants removed misleading information from its website. Plaintiff contends that this action benefitted the public and therefore Plaintiff's case benefits the public. The Court rejects this argument because the cases addressing whether a party's case benefits the public focus on the relief *sought*, not incidental benefits to the public resulting from the plaintiff bringing the suit.

> **2.      Plaintiff may not bring claim under Uniform Deceptive Trade Practices Act.**

The sole remedy available under the Uniform Deceptive Trade Practices Act, Minn. Stat. § 325D.44 is injunctive relief. Plaintiff lacks standing to seek injunctive relief based on his past injury. *Cherne Indus.,* 278 N.W.2d at 92.

**B.      Negligent Misrepresentation Claim (Count V)**

Minnesota law does not recognize a cause of action for physical harm under a negligent misrepresentation theory. *Grozdanich v. Leisure Hills Health Center, Inc.*, 25 F.Supp.2d 953, 987 (D. Minn. 1998). At the hearing, Plaintiff conceded that this claim should be dismissed. Therefore, Defendants' request for summary judgment on Count V must be granted.

**C.      Duty to Warn (Counts I and IV)**

Defendants seek summary judgment on Plaintiff's failure to warn claims in Counts I and IV. It is a question of law whether or not a manufacturer has a duty to warn of the danger associated with using a product. *Germann v. F.L. Smithe Mach. Co.*, 395 N.W.2d 922, 924 (Minn. 1986). Minnesota law recognizes the learned intermediary theory in the medical field context. The theory provides that a manufacturer can satisfy its duty to warn by supplying the plaintiff's physician with an adequate warning. *Johnson v. Zimmer*, 2004 WL 742038, *9 (March 31, 2004) (citations omitted). If the court finds that a manufacturer had a duty to warn, factual issues of adequacy of

6

warning, breach of the duty and causation are considered by the factfinder. *Balder v. Haley*, 399 N.W.2d 77, 81 (Minn. 1987).

Relying on *Mozes v. Medtronic, Inc.*, 14 F.Supp.2d 1124, 1130 (D. Minn. 1998), the Defendants argue that summary judgment is appropriate in this case because, they contend, as in *Mozes*, it is undisputed that the learned intermediary has been warned of the dangers of the medical device. Contrary to Defendants' contention, the Plaintiff disputes that the doctor in this case, Dr. Welchin, was warned of the dangers of the medical device. The Plaintiff contends that Dr. Welchin read the "product handout," not the package insert (which contained the warning not to use the tack to repair a SLAP lesion). (Pl. Ex. E at 12.) Plaintiff presents evidence that James Thornton, the sales representative/detail man who sold Dr. Welchin the Bankart tack, stated that package inserts were not given to doctors and were not used to sell the tack. (Pl. Ex. 1 at 50.) With respect to this claim, the parties dispute a genuine issue of material fact - whether Dr. Welchlin read the package insert - which renders summary judgment on this claim inappropriate.

The Defendants also contend that Plaintiff's claim of an inadequate warning should be dismissed as a matter of law because "the Eighth Circuit Court of Appeals has held that 'an issue as to the adequacy of a warning necessarily presupposes that the operator has read the warning.'" *J & W Enterprises, Inc. v. Economy Sales, Inc.*, 486 N.W.2d 179, 181 (Minn. Ct. App. 1992) (quoting *Johnson v. Niagara Mach. & Tool Works*, 666 F.2d 1223, 1225 (8th Cir. 1981)); *Johnson v. Zimmer*, 2004 WL 742038 at *10. In *Zimmer*, the court dismissed on summary judgment an inadequate warning claim because the doctor in that case stated he never read the warning. The court found that causation did not exist as a matter of law regardless of the inadequacy of the warning.

In response, Plaintiff contends that the adequacy of the warning is not the issue but rather the manner in which the warning was given. Plaintiff contends that this case is like *Sterling Drug, Inc. v. Yarrow*, 408 F.2d 978, 992 (8th Cir. 1969) where, even though there were written warnings given to doctors about the danger of a prescription drug, those warnings were inadequate because the company failed to use the "usual means of communication" between doctors and the company to convey the message. *Id.* Both in *Sterling* and in this case, the companies failed to use the "detail men," or those who sold the product to the doctors, to convey the message. *Id.* at 990. In this case, James Thornton, the sales representative who sold Dr. Welchlin the Bankart tack, testified that package inserts were not given to surgeons or used to sell the product and that the company never told him that Bankart tacks could not be used for SLAP lesion repair. (Pl. Ex. 1 at 42-43, 50.) In *Sterling*, the Eighth Circuit upheld a verdict based on a failure to warn. *Sterling*, 408 F.2d at 995. This case is similar to *Sterling* in that the company actually *promoted* use of the Bankart tack for SLAP lesions through its usual means of communication. That is, the sales people who sold the tacks to doctors were not told of the warning on the product insert and the sales person who sold the tack to Dr. Welchlin admitted that he did not read the package insert and he continued to recommend to doctors to use the Banckart tack. (Pl. Ex. 1 at 42-43, 50.) This Court rejects Defendants' argument that this case is like *Zimmer* and should be dismissed for lack of causation. For the reasons stated above, summary judgment is not appropriate on this claim.

**D.  ConMed Corporation and Linvatec Corporation**

Defendants request that summary judgment be granted with respect to Defendant ConMed Corporation and Defendant Linvatec Corporation because neither company produces or distributes the Bankart Tack. The parties do not dispute that a subsidiary of ConMed, Linvatec Biomaterials,

Oy, produces the tack and another subsidiary of ConMed, Linvatec Biomaterials, Inc., distributes the tack in the United States.

In order to be liable in a negligence or strict products liability action for injury caused by a defective product, a party must have been in the product's chain of distribution.  *In re Minnesota Breast Implant Litigation*, 36 F.Supp.2d 863, 872-73 (applying the Restatement (Second) of Torts § 402A which had been adopted by Minnesota courts); *Agristore Leasing v. Hansen et al.*, 1985 U.S. Dist. LEXIS 22610, *8 (D. Minn. 1998) (noting that Minnesota has adopted the definition of strict liability set forth in the Restatement (Second) of Torts § 402A).

ConMed is the sole shareholder in Linvatec Biomaterials, Inc. and Linvatec Biomaterials, Oy.  (Pl. Ex. 22.)  As a general matter, shareholders are not personally liable for the debts of the corporation.   *See Milwaukee Motor Transp. Co. v. Comm'r of Taxation*, 193 N.W.2d 605, 608 (Minn. 1971); *Corcoran v. P.G. Corcoran Co.,* 71 N.W.2d 787, 795 (Minn. 1955); *Rommel v. New Brunswick Fire Ins. Co.*, 8 N.W.2d 28, 32 (Minn. 1943).  This general principle also applies in the corporate parent subsidiary context.  The law presumes that a subsidiary is a legally separate entity from the parent.  *H.J. Inc. v. Int. Tel. & Tel. Corp.*, 867 F.2d 1531, 1549 (8th Cir. 1989).

Nevertheless, the court may pierce the corporate veil and hold the shareholders liable for the debts of the corporation where: (1) the corporation functioned as a mere instrumentality of the shareholders; and (2) injustice or fundamental unfairness would occur if the corporate veil were left intact.  *Victoria Elevator Co. v. Meridien Grain Co., Inc.*, 283 N.W.2d 509, 512 (Minn. 1979).  In addressing prong one, the court looks for the presence of factors including: insufficient capitalization for purposes of corporate undertaking, failure to observe corporate formalities, nonpayment of dividends, insolvency of debtor corporation at the time of the transaction in question, siphoning of

funds by dominant shareholder, non-functioning of other officers and directors, absence of corporate records, and the existence of the corporation as merely a facade for individual dealings.  In order to meet prong two, the court must find an "element of injustice or fundamental unfairness" with respect to the relationship between the corporation and the plaintiff.  *White v. Jorgensen*, 322 N.W.2d 607 (Minn. 1982) (citing *Victoria Elevator,* 283 N.W.2d at 512).  This does not mean there must be proof of strict common law fraud; evidence showing the corporate entity has been operated as a constructive fraud or in an unjust manner is sufficient.  *Id*.  "Although Minnesota case law has not tailored the factors relevant to piercing the corporate veil to the relationship between a parent corporation and a subsidiary, those factors have been held to apply in the parent-subsidiary context." *Association of Mill & Elevator Mut. Ins. Co. v. Barzen Int'l, Inc.*, 553 N.W.2d 446, 449 (Minn. Ct. App. 1996).

### 1.      Linvatec Corporation

The Court agrees with Defendants that Linvatec Corporation is not a proper Defendant in this case.  Linvatec Corporation was not in the product's chain of distribution at the time of the injury and therefore cannot be liable on a strict liability or negligence theory.  (Decl. of Andrew W. Beakman at ¶¶ 8, 17.)  The Plaintiff's alter ego and successor liability arguments do not apply to Linvatec Corporation because Linvatec Corporation is not a shareholder of Linvatec Biomaterials, Oy or Linvatec Biomaterials, Inc and it was not involved in the merger between ConMed's subsidiary Arrow and Bionx (which was renamed Linvatec Biomaterials, Oy and Linvatec Biomaterials, Inc).  (*Id*. at ¶ 15.)  Linvatec Corporation is a subsidiary of ConMed Corporation just like Linvatec Biomaterials, Oy and Linvatec Biomaterials, Inc.  (*Id.* at ¶ 14.)  Because Linvatec Corporation is not a shareholder in either Linvatec Biomaterials, Oy or Linvatec Biomaterials, Inc.,

it cannot be held liable on either an alter ego or a successor liability theory.

This Court finds that summary judgment should also be granted as to Linvatec Corporation with respect to Plaintiff's claims for breach of warranty (Counts II and III) and negligent misrepresentation (Count V) because Linvatec Corporation had no involvement in the sale of the Bionx Bankart Tacks to the doctor involved in this case.  Linvatec's parent corporation, ConMed Corporation, did not even acquire Bionx until March of 2003.   Ryan Wehner's surgery was conducted on June 10, 2002. *See In re Minnesota Breast Implant Litigation*, 36 F.Supp.2d at 872-73 (dismissing plaintiff's warranty claims, false advertising claims and negligent misrepresentation claims where corporate defendant was not involved in the manufacture or sale of the product alleged to have injured the plaintiff).

### 2. ConMed Corporation

The Court finds that ConMed cannot be liable on a strict liability or negligence theory because it was not in the product's chain of distribution at the time of the injury.  (Decl. of Andrew W. Beakman at ¶¶ 8, 17.)

The Court also finds that ConMed Corporation cannot be liable in this case on a successor liability theory.  The Plaintiff contends that because ConMed acquired all of the assets and liabilities of Bionx through a merger that it assumed those assets and liabilities and is therefore personally liable for the debts of Bionx.  Defendants present evidence that Bionx was merged into a subsidiary of ConMed, Arrow Corporation, which was formed solely for the purpose of the merger.  After the merger, the only remaining subsidiary was Bionx which ConMed then renamed Linvatec Biomaterials.  As noted above, the law presumes that a subsidiary is a legally separate entity from its parent. *H.J. Inc. v. Int. Tel. & Tel. Corp.*, 867 F.2d 1531, 1549 (8th Cir. 1989).  Because ConMed

is simply a shareholder of Bionx, it cannot be liable for the debts of Bionx.  Shareholders are not personally liable for the debts of a corporation absent a showing that the court should pierce the corporate veil.

With respect to whether to pierce the corporate veil because ConMed is the alter ego of its subsidiaries, the Court concludes factual disputes preclude the granting of Defendants' summary judgment motion.

With respect to prong one of the *Victoria Elevator* test, Plaintiff has put forth evidence that, based on public filings, ConMed does not provide separate accounting statements for Linvatec Biomaterials, Inc. and Linvatec Biomaterials, Oy.  This evidence that demonstrates Plaintiff's inability to determine whether ConMed is siphoning funds from its subsidiaries or whether the subsidiaries are insufficiently capitalized or whether there is an absence of corporate records.  (Pl. Ex. 23 at 36.)   Plaintiff has presented evidence that the boards of ConMed and Linvatec Biomaterials, Inc. are exactly the same save that Linvatec Biomaterials, Inc. has an additional board member who is not on the ConMed board.  (Pl. Ex. 23 at 5, 36.)  This board set up indicates that the one member of the Linvatec Biomaterials board who is not a member of the ConMed board cannot function independently of the preferences of the ConMed board members.  Plaintiff has presented evidence that the Defendants have not been observing corporate formalities.  Neither Linvatec Biomaterials, Inc. nor Linvatec Biomaterials, Oy are listed in the 2004, 2005 or 2006 annual reports as separate operating units.  (Pl. Ex. 24, 25 and 26.)  The product catalog containing the Bankart Tack after the merger is a ConMed Linvatec catalog, not a Linvatec Biomaterials Inc. catalog.  (Pl. Ex. 5.) On the ConMed website the Linvatec Biomaterials, Oy facility in Tampere, Finland is listed and ConMed writes: "[t]his facility also came along with the acquisition of Bionx in 2003.  It serves

as the manufacturing facility for the former Bionx procedure specific sports medicine products that are marketed under the ConMed Linvatec name." (Pl. Ex. 29.)

With respect to prong two of the *Victoria Elevator* test, Plaintiff must show an element of unfairness in the relationship between the Plaintiff and the corporation. In this case, Plaintiff has been unable to get assurances from Defendants that the Linvatec Biomaterials companies can cover a judgment, and Plaintiff has presented evidence that the Defendants' insurance coverage for his injuries is in dispute. Two insurance companies have denied the Defendants coverage of the incident, and Defendants have brought a law suit in Pennsylvania against MedMarc Insurance Company to enforce coverage. (Pl. Ex. 19.) When determining whether to grant summary judgment, the court must view all of the facts in the light most favorable to the non-moving party and give the non-moving party the benefit of all reasonable inferences that can be drawn from those facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). Viewing the facts in the light most favorable to the Plaintiff, summary judgment is not proper at this time on this claim.

Defendants contend that in order for ConMed to be liable on an alter ego theory, it must have been the alter ego at the time the torts were committed. *Iridex Corp. v. Synergetics USA, Inc.*,. 474 F.Supp.2d 1105, 1110 (E.D. Mo. 2007). In *Iridex*, the court was applying Missouri law to plaintiff's alter ego claim. One element of establishing an alter ego claim under Missouri law is that the shareholder's control of the company proximately caused the injury or the unjust loss. *Id.* Minnesota law does not require such a showing. As set out above, Minnesota law focuses on the shareholder's relationship to the corporation and the relationship of the plaintiff to the corporation. The Court is unaware of any Minnesota law and Defendants have failed to cite to any Minnesota law

requiring that the shareholder be the alter ego of the corporation at the time the tort was committed.

The Defendants also contend that Plaintiff has cited to no evidence that would create an issue of fact on the second prong of the alter ego standard. The second prong of the alter ego standard addresses the relationship of the plaintiff to the corporation and requires a showing of "an element of injustice or fundamental unfairness." *White v. Jorgensen*, 322 N.W.2d 607, 607 (Minn. 1982). A showing that the corporation "has been operated as a constructive fraud or in an unjust manner must be presented." The Defendants cite to *In re Intelefilm Corp.*, 301 B.R. 327, 332 (Bkrtcy. D. Minn. 2003) for the proposition that "[t]he sort of unjust conduct that will satisfy the second prong must be a 'wrong beyond a creditor's inability to collect' on account of the debt." The court in that case, however, goes on to note that the second prong has been deemed satisfied where "a parent corporation that caused a sub's liabilities and its inability to pay for them would escape those liabilities; or an intentional scheme to squirrel assets into a liability-free corporation while heaping liabilities upon an asset-free corporation would be successful." *Id.*

The Defendants also contend that because Bionx was insured at the time of Ryan Wehner's injury and ConMed continued to insure Bionx (now Linvatec Biomaterials, Oy and Linvatec Biomaterials, Inc.) a finding of constructive fraud under prong two of the test is precluded because insuring a subsidiary is irreconcilably inconsistent with operating the subsidiary as a constructive fraud. *Radaszewski v. Telecom*, 981 F.2d 305, 310 (8th Cir. 1992). In *Radaszewski*, the court was applying Missouri law and was addressing the insurance issue with respect to whether or not the subsidiary was undercapitalized. The insurance issue in this case is more appropriately addressed under prong two of the *Victoria Elevator* test. In this case the Defendants have failed to give assurances or present evidence that the subsidiaries are sufficiently capitalized to cover a judgment

should insurance coverage be denied.  Defendant's position establishes an element of unfairness between the Plaintiff and Defendant, as required by prong two of the *Victoria Elevator* test. Summary judgment on Plaintiff's alter ego theory with respect to ConMed must be denied.

**E.      Defendants' Motion to Exclude Portions of Dr. Michael Q. Freehill's Testimony**

Defendants move to exclude Dr. Freehill's testimony on the study he and his partner, Dr. Buss,  conducted on patients who had a Bankart tack implanted during shoulder surgery performed by Dr. Buss between 1997 and 1999.  More specifically, Defendants move to exclude testimony on the following:

1.      The study his group undertook and published concerning the Bionx tack, including the results of the study and opinions reached concerning the safety and effectiveness of the tack, and any communications his story group had with Bionx concerning the study.
2.      Any opinions formed concerning the subject tack based on Dr. Freehill's study and experience with Bionx tacks in connection with his treatment of Plaintiff.
3.      The degradation and reabsorption of PLLA, and any purported complications or reactions in the use of the tack devices.
4.      Any purported link between reactions to crystalline material and/or PLLA, and the surgical tack device.
5.      That the damage to Plaintiff's shoulder is connected to any byproducts of the degradation of the Bionx tack.

(Defendants' Motion to Exclude Portions of Dr. Michael Q. Freehill's Testimony)

Rule 702 of the Federal Rules of Evidence provides that "a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case."  Stated more succinctly, the expert must be qualified and the testimony must be relevant and reliable.  *Lauzon v. Senco Products, Inc.,* 270 F.3d 681, 686 (8th Cir. 2001).

Rule 702 favors admissibility if the testimony will assist the trier of fact.  *See Justice v. Carter*, 972 F.2d 951, 957 (8th Cir.1992).  Doubts regarding " 'whether an expert's testimony will be useful should generally be resolved in favor of admissibility.' " *Larabee v. MM & L Int'l Corp.*, 896 F.2d 1112, 1116 n. 6 (8th Cir.1990) (quoting J. Weinstein & M. Berger, Weinstein's Evidence, para. 702[02] at 702-30 (1988)).

**1.     Whether Dr. Freehill is Qualified to Testify**

Dr. Freehill is qualified to testify as an expert in this case.  He is an orthopedic surgeon who specializes in shoulder and elbow surgery.  (Pl. Ex. A at 7.)  In addition, Dr. Freehill is familiar with the product at issue in this case because he and his partner Dr. Buss conducted a study on 52 patients who had the Bankart tack implanted during shoulder repair surgery at their institute.  (Pl. Ex. F.)

Defendants contend that Dr. Freehill is not qualified to opine on the degradation process of the PLLA tacks because he is not an expert on the process of PLLA breakdown in the body. In response, Plaintiff contends that an expert does not have to be an expert in all areas to give valid testimony and that any alleged lack of particularized expertise goes to the weight accorded to the testimony, not admissibility.  *United States v. Garcia*, 7 F.3d 885, 890 (9th Cir. 1993); *Daubert*, 509 U.S. at 592 ("[A]n expert is permitted wide latitude to offer opinions, including those not based on first hand knowledge or observation.").  Plaintiff also cites to *Clark v. Heidrick*, 150 F.3d 912, 915 (8th Cir. 1998) for the proposition that experts offering a global understanding of the possible causes of an injury are useful to a jury.  The Court agrees with the Plaintiff that even though Dr. Freehill is not an expert in the degradation process of the PLLA tacks, he has observed the effects of tack breakdown in the body on numerous occasions and his

experience offers a global understanding of the possible causes of the Plaintiff's injury.

### 2.    The Study is Relevant

Defendants request that this Court exclude testimony about the study conducted by Dr.

Freehill and Dr. Buss on patients implanted with the Bankart tack.  In this case, the Plaintiff had

two tacks implanted in his shoulder and alleges that the tacks caused his shoulder to degenerate

and require total replacement.  The study is certainly relevant to this case because it addressed

complications confronted by patients who had surgeries similar to the Plaintiff's surgery.  The

Court will not exclude Dr. Freehill's testimony on relevancy grounds.

### 3.    The Study is Reliable

The Supreme Court set out a number of factors a court should look to in determining

whether an expert's  testimony is scientifically valid and whether that reasoning or methodology

properly can be applied to the facts in issue.  *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S.

579, 592 (1993).  These factors include but are not limited to: (1) whether the theory or

technique has been tested; (2) whether the theory or technique has been subject to peer review

and publication; (3) the technique's known or potential rate of error; and (4) whether the theory

or technique has been generally accepted in the relevant scientific community.  *Id.* at 593-94.

Defendantscontend that the study has not been tested or reasonably assessed for

reliability.  Defendantscontend  that Dr. Freehill's opinion does not assist the trier of fact to

understand the evidence or to determine a fact in issue because Dr. Freehill conducted an

isolated study of 52 patients, all of whom were operated on by Dr. Freehill's partner, Dr. Buss,

within a two year time period.  Defendants contend that this isolated study will not assist the trier

of fact in determining causation relative to Plaintiff's claims.  Defendants contend that the fact

that the study was published does not establish reliability.  The study was published five years ago in the American Journal of Medicine and since then the study has not been duplicated, further explored or reproduced; Defendants claim the study has "fallen on deaf ears" in the scientific community.  Defendants contend that the method used by Dr. Freehill to conduct the study is not generally accepted in the scientific community because it is retrospective and Dr. Freehill  admits that the study would carry more weight if it were prospective.

Plaintiff contends that Dr. Freehill should be able to testify to the results of his study because the study was published in a prestigious peer reviewed journal, the American Journal of Sports Medicine.  (Pl. Ex. F.)  Plaintiff also points out that the research was conducted prior to and separate from the doctor's involvement in this litigation, citing to *Metabolife Int'l, Inc. v. Wornick*, 264 F.3d 832, 841 (9th Cir. 2001) *citing Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 43 F.3d 1311, 1317 (9th Cir. 1995), *cert. denied*, 516 U.S. 869 (1995),  for the proposition that "a very significant fact to be considered is whether the experts are proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation."  The *Metabolife* court further expounded: "[t]hat an expert testified on research he has conducted independent of litigation provides important, objective proof that the research comports with the dictates of good science."  *Metabolife*, 264 F.3d at 841.  In response to Defendants' contention that the article received no response from the medical community, Plaintiff points out that since its publication, the article has been cited in six other articles.  (Pl. Ex. 3.)

In response to Defendants' contention that the study is isolated and would not be helpful to the trier of fact, Plaintiff points out that Dr. Freehill's study involved far more patients than

the study conducted by a Finnish doctor, Urho J. Vaatainen, for Bionx in order to secure FDA approval for the Bankart tack.  Vaatainen followed 13 patients for two years after they had a tack implanted.  Dr. Freehill's study, on the other hand, examined 52 patients who had the tack implanted.

The Court acknowledges that the study is not prospective and has not been tested.  On the other hand, the study was published in a peer reviewed journal and has subsequently been cited in six other articles.  The Eighth Circuit has held that: "As a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination.  Only if the expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury must such testimony be excluded." *Bonner v. ISP Techs., Inc.*, 259 F.2d 924, 929-30 (8th Cir. 2001).  The Court finds that Dr. Freehill's testimony on the study will offer some assistance to the jury in assessing the effectiveness of the Bankart tack.  Therefore, the Court denies Defendant's request to exclude the testimony.

## IV.  RECOMMENDATION

Based upon all the files, records and proceedings herein, **IT IS HEREBY RECOMMENDED** that Defendants' Motion for Partial Summary Judgment [#86] be **GRANTED in part** and **DENIED in part**, as follows:

1.    To the extent that Defendants seek summary judgment on Count VI, the Court recommends the motion be **GRANTED**.

2.    To the extent that Defendants seek summary judgment on Count V, the Court recommends the motion be **GRANTED**.

3.    To the extent Defendants seek summary judgment on the failure to warn claims in Counts I and IV, the Court recommends the motion be **DENIED**.

4.      To the extent Defendants seek summary judgment on all claims with respect to Linvatec Corporation, the Court recommends the motion be **GRANTED**.

5.      To the extent Defendants seek summary judgment on all claims with respect to ConMed, the Court recommends the motion be **DENIED**.

        Based upon all the files, records and proceedings herein, **IT IS HEREBY**

**RECOMMENDED** that Defendants' Daubert Motion to Exclude Portions of Dr. Michael Q.

Freehill's Testimony [#93] be **DENIED**.


DATED: December 4, 2007                    s/ *Franklin L. Noel*
                                           FRANKLIN L. NOEL
                                           United States Magistrate Judge



Pursuant to the Local Rules, any party may object to this Report and Recommendation by filing with the Clerk of Court and serving on all parties, on or before **December 21, 2007**, written objections which specifically identify the portions of the proposed findings or recommendations to which objection is being made, and a brief in support thereof. A party may respond to the objecting party's brief within ten days after service thereof.  All briefs filed under the rules shall be limited to 3500 words. A judge shall make a de novo determination of those portions to which objection is made.

Unless the parties are prepared to stipulate that the District Court is not required by 28 U.S.C. § 636 to review a transcript of the hearing in order to resolve all objections made to this Report and Recommendation, the party making the objections shall timely order and cause to be filed by **December 21, 2007,** a complete transcript of the hearing.

This Report and Recommendation does not constitute an order or judgment of the District Court, and it is, therefore, not appealable to the Circuit Court of Appeals.